## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

EPIQ EDISCOVERY SOLUTIONS, INC.    )
    )
    Plaintiff,    )
    )
    v.    )    Case No. 2:25-cv-02026
    )
JOHN STANTON and LINEAL SERVICES, LLC, )
    )
    Defendants.    )
_____)

## VERIFIED COMPLAINT

Plaintiff Epiq eDiscovery Solutions, Inc. ("Epiq") submits its Verified Complaint against John Stanton and Lineal Services, LLC ("Lineal"), stating as follows:

## I.    NATURE OF THE ACTION

1.    This is an action for injunctive relief and attorney's fees and costs arising from John Stanton's brazen breach of his post-employment obligations to Epiq under the terms of the Employment, Confidential Information, Invention Assignment and Arbitration Agreement ("Employment Agreement") that Stanton executed on January 1, 2015. A true and correct copy of the Employment Agreement is attached hereto as Exhibit A.

2.    Stanton was employed with Epiq in a sales position for more than 10 years. He resigned from Epiq to join Lineal, a direct competitor to Epiq, as a salesperson. In that role, Stanton would be providing Lineal with services that are the same or similar to those he provided to Epiq, a clear breach of his promise in the Employment Agreement. Stanton's last day with Epiq was November 15, 2024, and he was to start his employment with Lineal in January 2025.

3.    In addition, Epiq has determined that, before leaving Epiq, Stanton downloaded and stole competitively sensitive information and trade secrets from Epiq's electronic systems and

deleted sensitive information from his Epiq accounts. That conduct not only breached Stanton's obligations under the Employment Agreement, it also violated state and federal law.

II.    **PARTIES, JURISDICTION, AND VENUE**

4.    Epiq is a Delaware corporation with its principal office located in New York.

5.    Stanton is a natural person who, upon information and belief, is a citizen of the State of Kansas residing at 11206 West 169th Street, Overland Park, Kansas, 66221.

6.    Lineal is a Texas limited liability company with its principal office located at 14605 NW 73rd Street, Parkville, Missouri, 64152. Lineal is registered to do business in the State of Kansas and has appointed C T Corporation System, 112 SW 7th Street, Suite 3C, Topeka, Kansas, 66221 as its Kansas registered agent.

7.    This Court has personal jurisdiction over Stanton because he is a Kansas citizen and resident and because he consented to the jurisdiction of federal courts located in the State of Kansas by executing the Employment Agreement.

8.    This Court has personal jurisdiction over Lineal because it has registered to do business in and regularly conducts its business in the State of Kansas.

9.    This Court has subject matter jurisdiction of this action under 28 U.S.C. § 1332 because it is a civil action between citizens of different states in which the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

10.    This Court also has subject matter jurisdiction over Count I of this matter under 28 U.S.C. § 1331 because this Count of the Complaint presents a federal question under the Defend Trade Secrets Act, 18 U.S.C. § 1836, et seq. ("DTSA"). This Court has supplemental jurisdiction over the remaining claims under 28 U.S.C. § 1367(a) because they are related to the DTSA claim such that they form part of the same case or controversy.

1616104207.6

11.     Venue is proper in this Court under 28 U.S. C. § 1391 because Defendants do business in and committed tortious acts or injuries in this juridical district and a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this judicial district.

## III.    FACTUAL BACKGROUND

### A.    Epiq's Business

12.     Epiq is a leading provider of e-discovery tools and services that leverage AI and analytics to empower its law firm and corporation customers with technology to deliver a consultative, coordinated, secure, and defensible end-to-end discovery process. Epiq offers its customers a "managed services" package that provides a programmatic approach to the client's entire portfolio of matters with data security, defensible workflows, AI-based analytics, direct administrative capabilities, business intelligence reports, and cost predictability.

13.     Epiq is the successor-by-merger to Iris Data Services, Inc.

14.     Epiq is a subsidiary of Epiq Systems, Inc., a leading global services provider to the legal industry and corporations of innovative, technology-enabled solutions to streamline the administration of business operations, administer court reporting and e-discovery functions, and manage class action, mass tort, regulatory, compliance, and restructuring and bankruptcy matters.

15.     As part of Epiq's services, it uses cutting-edge and confidential technology and processes to provide e-discovery solutions to customers.

16.     Epiq relies on its confidential information and trade secrets in developing, implementing, marketing, and selling its goods and services. Epiq spends substantial funds and dedicates extensive efforts to the development of innovations supporting its business. Such information is carefully guarded and is not made accessible to the public or to Epiq's competitors.

1616104207.6

This information gives Epiq a distinct competitive advantage over others who do not have access to this information.

17.     Likewise, Epiq expends substantial resources in developing and cultivating customer relationships and otherwise establishing its reputation for high quality in the industry. To effectively compete in its industry, Epiq relies on confidential information and trade secrets to create customized service models accompanied by competitive pricing for its customers. To protect its competitive advantage, Epiq also maintains confidentiality as to the identity of its customers, the nature and breadth of the services it provides to each such customer, and the pricing model offered to each customer.

18.     Such information has been compiled and created over many years at substantial effort and expense and is not publicly available.

19.     Epiq protects its confidential information and trade secrets in numerous ways to prevent its dissemination, both within the organization and outside of Epiq.

20.     Epiq does not advertise the identity of its customers or the nature or breadth of services it provides to any individual customer. Such information is available only to a limited number of Epiq employees whose job requires such knowledge, and Epiq employees do not have access to any comprehensive list of Epiq customers.

21.     Epiq's individual client contracts, which contain both information about the nature and breadth of services offered to the client and Epiq's custom pricing for such services package, are maintained in password-protected files with access permissions limited to specific employees with a business need for the information.

22.     Epiq's client contracts also contain confidentiality provisions prohibiting the dissemination of information about the terms of such contracts by the countersigning client.

1616104207.6

23.    The secrecy of the identity of Epiq's customers, the terms of their service agreements with Epiq, and the pricing models applied for Epiq's service offerings is a source of independent economic value to Epiq.

24.    Because of the safeguards Epiq employs to protect that secrecy, through several layers of security measures, the information is not readily ascertainable by those outside of Epiq, or even to those employed by Epiq who are without particular permissions.

25.    If a direct competitor of Epiq were to become privy to Epiq's confidential information and trade secrets described above, it would be devastating to Epiq's competitive advantage, as such a competitor would be able to readily ascertain and easily target Epiq's customers to unfairly undercut Epiq's business.

**B.    Lineal's Business**

26.    Lineal markets itself as offering data-focused "managed services" and tools to assist law firm and corporation clients with e-discovery and investigations, including a data review suite for data processing, review, and management. Lineal is a direct competitor to Epiq.

**C.    Stanton's Employment with Epiq**

27.    Stanton was employed by Epiq in Overland Park, Kansas, as an Account Director for its e-discovery business from December 8, 2019, until November 15, 2024. Before that, he had been employed in other sales roles for Epiq or its predecessor, Iris Data Services, since January 2012.

28.    In his role as Account Director, Stanton was responsible for acquiring and managing client relationships with companies and law firms who engage Epiq to provide a broad array of services to assist them with information management and e-discovery solutions.

29.     During his employment with Epiq, Stanton was entrusted with competitively sensitive confidential business and financial information and trade secrets. He had daily access to and responsibility for a significant amount of Epiq's highly sensitive information concerning Epiq's customer information, contract terms, and pricing models for its many service offerings.

30.     In particular, Stanton regularly worked with clients who were parties to "Managed Services Agreements" with Epiq, which are agreements for the ongoing (rather than transaction-based) provision of Epiq's most comprehensive service packages.

31.     But for Stanton's employment with Epiq, he would not have been privy to information about the identity of Epiq's customers, the terms of those customers' service agreements with Epiq, or the pricing model applied for the services offered to such customers.

**D.      Epiq's Employment Agreement with Stanton**

32.     On or about January 1, 2015, as a condition of his employment, Stanton voluntarily entered into and electronically executed the Employment Agreement, which contains post-employment restrictions for non-competition, customer and employee non-solicitation, and non-disclosure of confidential information. These restrictions are vital to the protection of Epiq's legitimate business interests and ensuring that Epiq employees, particularly client-facing employees like Stanton, do not utilize or disclose Epiq's confidential information and trade secrets or exploit Epiq's customer or employee relationships.

33.     On November 21, 2024, one week after the end of his employment with Epiq, Stanton reaffirmed his obligations under the Employment Agreement by his electronic signature, attesting (a) that he was in compliance with those obligations at the time and (b) that he would continue to abide by the terms of that contract. A true and correct copy of Stanton's reaffirmation is attached hereto as Exhibit B.

34.    Under the Employment Agreement, Stanton agreed not to use in any way, directly or indirectly, or to disclose to any person, firm, corporation, or other entity, except for the direct benefit of Epiq, any of Epiq's "Confidential Information," and to immediately return to Epiq all such materials and all Epiq property upon leaving the employ of Epiq.  *See* Ex. A, §§ 3, 13.

35.    The Employment Agreement defines Confidential Information as follows:

> [A]ny information of Epiq, its customers, vendors, personnel, or other business relations, in each case, prior, current or prospective, including but not limited to any proprietary information, technical data, trade secrets or know-how, information relating to research, product plans, products, services, customer lists, customers, markets, software, developments, inventions, processes, formulas, technology, designs, drawings, engineering, hardware configuration, marketing or finances, or other business information in any form, including but not limited to electronic, oral, visual, or hard copy.

*See* Ex. A, § 3.

36.    Under the Employment Agreement, Stanton agreed to the following non-competition restriction:

> for a period of twelve (12) months immediately following the termination of my employment with the Company for any reason, I will not compete against the Company or engage in employment with or provide independent contractor or consulting services for any person, corporation, firm or other entity which provides any service or services which are the same or similar to any service or services offered by the Company within its territories.

*See* Ex. A, § 12.

37.    Stanton further agreed that the post-employment non-competition restriction was reasonable for the protection of Epiq's legitimate business interests. Indeed, Section 12 of the Employment Agreement states that Stanton "recognize[s] and acknowledge[s] that by virtue of accepting employment hereunder, I will acquire valuable knowledge, enhance my professional skills and experience, and learn proprietary trade secrets and Confidential Information of Epiq"

and "agree[s] to the reasonableness of the restraint imposed under this paragraph." *See* Ex. A, § 12.

38.    Likewise, and in recognition of the importance of Stanton's relationships with Epiq's customers and employees, the Employment Agreement prohibited solicitation of Epiq's customers for a period of twelve (12) months following the termination of his employment. *See* Ex. A, § 15.

39.    Specifically, Stanton agreed to the following:

> for a period of twelve (12) months immediately following the termination of my employment relationship with the Company for any reason, I shall not, directly or indirectly, either on behalf of myself or for any other person, corporation, firm, company or other business entity, do any of the following acts: (a) solicit, serve or cater to any of the Epiq's customers whom I solicited, served or catered to on behalf of Epiq or with whom I became acquainted during the course of my employment with the Company; (b) divert or attempt to divert any of Epiq's customers or any of the business or patronage of such customers; or (c) call upon, influence or attempt to influence any of Epiq's customers to transfer their business or patronage from Epiq to me or to any other person, corporation, firm, company or business entity engaged in a business similar to Epiq's business.

*See* Ex. A, § 15.

40.    In addition, Section 15 of the Employment Agreement states that Stanton "acknowledge[s] and agree[s] that the names and addresses of Epiq's customers constitute Confidential Information of Epiq, and that [his] sale or unauthorized use or disclosure of any such Confidential Information would constitute unfair competition." *See* Ex. A, § 15.

41.    Moreover, Section 17 of the Employment Agreement states that the non-competition and non-solicitation restrictions set forth in Sections 12, 15, and 16 "shall not expire, and shall be tolled" during any period in which Stanton was in violation of those obligations and "all restrictions shall automatically be extended by the period [Stanton] was in violation of any such restrictions." *See* Ex. A, § 17.

42.     Stanton voluntarily chose to accept employment with Epiq and agreed to the post-employment restrictions in the Employment Agreement, which were a condition for his employment. Stanton was not in an unequal bargaining position, nor was he unaware of the full extent of the restrictions or unable to reject the offer made to him.

43.     Stanton was highly compensated as an Account Director for Epiq.

44.     Stanton made an informed decision to accept Epiq's offer of employment and to continue working for Epiq for almost ten years.  He reaffirmed his commitment to honor his post-employment obligations to Epiq on November 21, 2024.  And he now must do so.

**E.      Stanton's Resignation and Acceptance of Employment with Lineal**

45.     On or about October 31, 2024, Stanton submitted his resignation to Epiq. Shortly thereafter, he informed Epiq that he was resigning to join the sales force of Lineal, a company that provides some of the same services that Epiq provides (including e-discovery services) to a similar clientele in the same geographic area and marketplace, making it a direct competitor to Epiq.

46.     At the time of his resignation, Stanton agreed to assist with the orderly transition of client accounts and relationships to other Epiq employees before separating from the company. But he failed to faithfully carry out that duty and instead impeded such transitions.

47.     Stanton's last day of employment with Epiq was November 15, 2024. He advised Epiq that he would be starting his employment with Lineal, out of its Overland Park, Kansas, office, in early January 2025.

48.     On November 21, 2024, Stanton reaffirmed his obligations under the Employment Agreement by his electronic signature, attesting (a) that he was in compliance with those obligations at the time and (b) that he would continue to abide by the terms of that contract. *See* Ex. B.

1616104207.6

49.     By letter dated November 25, 2024, Epiq, through outside legal counsel, reminded Stanton of his post-employment obligations under the Employment Agreement, including the prohibitions against working for a competitor, using or disclosing Epiq's Confidential Information, and soliciting Epiq's customers or employees.  A true and correct copy of the November 25 letter to Stanton is attached hereto as Exhibit C.

50.     Despite Epiq's clear reminder to Stanton of his post-employment obligations, Stanton's response to that letter, issued through counsel, confirmed his intention to go to work as a salesperson for Lineal.

51.     By letter dated November 25, 2024, Epiq, through outside legal counsel, gave notice to Lineal of Stanton's post-employment obligations to Epiq under the Employment Agreement and warned Lineal that it might incur liability in the event that it proceeded to assist Stanton with violating those obligations and interfered with Epiq's contractual relations with Stanton and, potentially, with Epiq's clientele. A true and correct copy of the November 25 letter to Lineal is attached hereto as Exhibit D.

52.     Despite Epiq's clear notice to Lineal, the company's response to that letter confirmed its intention to proceed with employing Stanton as a salesperson for Lineal.

53.     On December 30, 2024, counsel for Epiq again sent letters to counsel for the two defendants in an attempt to resolve these issues short of litigation. Neither Defendant agreed to Epiq's requests and, indeed, the response from Lineal stated that Stanton had already started working for Lineal. True and correct copies of the December 30, 2024 letter to Stanton's counsel and to Lineal are attached hereto as Exhibits E and F, respectively.

54.     As discussed above, Stanton had a client-facing role with Epiq involving recruiting and managing client accounts. In that role, he had access to and responsibility for highly sensitive

and confidential business and financial information, including information constituting trade secrets, concerning Epiq's customers, product offerings, and pricing models.

55.    If allowed to proceed, Stanton's employment with Lineal will cause Epiq irreparable harm in the form of loss of goodwill, loss of business, loss of customers, exposure of confidential information and trade secrets, and a resulting loss of competitive advantage, among other things.

F.    **Stanton's Taking and Deletion of Epiq's Confidential Information**

56.    After his departure from Epiq and announcement of his intention to violate his non-competition restriction, the company undertook a forensic investigation of Stanton's computer use history and determined that Stanton downloaded substantial client information from Epiq's system and then deleted information from his Epiq e-mail account.

57.    Within the data that Stanton downloaded are highly sensitive customer contracting documents that not only identify customers of Epiq and information about them, as prohibited under the Employment Agreement, but also more than five years' worth of data regarding Epiq's managed services relationship with a significant law firm client with offices across the United States that Stanton serviced at Epiq.

58.    Stanton was aware, through the Employment Agreement and through Epiq's policies, that he was acquiring that information by improper means.

59.    The release or use of such information for Stanton's own benefit or for the benefit of another person or entity, such as Lineal, presents the threat of irreparable harm to Epiq's competitive position and should be prohibited by injunctive relief issued by this Court.

<u>**COUNT I**</u>

<u>**MISAPPROPRIATION OF TRADE SECRETS UNDER THE**</u>
<u>**DEFEND TRADE SECRETS ACT OF 2016 (18 U.S.C. § 1836, et seq.)**</u>
**(Against Stanton)**

60.     Epiq incorporates by reference herein the allegations contained in Paragraphs 1 through 59 of the Complaint, as if fully set forth herein.

61.     The DTSA provides that "[a]n owner of a trade secret may bring a civil action under [18 U.S.C. § 1836(b)(1)] if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce."

62.     The DTSA provides that injunctive relief is an available remedy "to prevent any action or threatened misappropriation . . . "18 U.S.C. § 1836(b)(3)(A).

63.     The DTSA provides that civil seizure of "property necessary to prevent the propagation or dissemination of the trade secret" is an available remedy. 18 U.S.C. § 1836(b)(2).

64.     The DTSA defines a "trade secret" to be:

"all forms and types of financial, business, scientific, technical, economic, or engineering information, including patters, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, complied, or memorialized physically, electronically, graphically, photographically, or in writing"

18 U.S.C. § 1839(3).

65.     Under the DTSA, misappropriation may be "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means." 18 U.S.C. § 1839(5)(A).

66.     Under the DTSA, misappropriation may also be "disclosure or use of a trade secret of another without express or implied consent by a person who . . . at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was . . . acquired under

1616104207.6

circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret or . . . derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret." 18 U.S.C. § 1839(5)(B)(ii).

67.     During Stanton's employment with Epiq, he was granted access to and knowledge of certain trade secrets of Epiq, including financial, business, technical, economic, or engineering information, including patterns, plans, designs, methods, techniques, processes, and procedures that Epiq had taken reasonable measure to keep secret and which were not readily ascertainable by those outside of Epiq or even by Epiq employees not granted specific permissions.

68.     Epiq derives independent economic value from the secrecy of that information through proper means.

69.     Epiq's trade secrets relate to a product or service used in, and intended for use in, interstate and/or foreign commerce.

70.     Stanton acquired Epiq's trade secrets through improper means.

71.     Stanton knew and had reason to know that his knowledge of trade secrets was acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secrets and to limit the use of the trade secrets.

72.     Stanton owed a duty to Epiq to maintain the secrecy of the trade secrets.

73.     Epiq has not granted Stanton permission or privilege to take or disclose its trade secrets.

74.     The fact that Stanton downloaded Epiq's trade secret information before leaving Epiq's employment, with the intention of taking a job with a direct competitor, Lineal, in the same marketplace, indicates that Stanton has or intends to use and/or disclose Epiq's trade secrets in the

course of his employment with Lineal for his own benefit and/or for the benefit of Lineal, acts that would cause irreparable harm to Epiq.

75.     There exists an imminent threat that Epiq's trade secrets will be disclosed and used to the detriment of Epiq that poses threat of irreparable harm to Epiq that cannot be fully compensated by money alone and thus Stanton must be enjoined.

76.     Epiq brings this action for injunctive relief and civil seizure to prevent the dissemination or use of its trade secrets and to obtain the return of any and all materials in the possession of Stanton that contain or constitute the trade secrets.

77.     As Stanton willfully and maliciously misappropriated its trade secrets, Epiq also seeks an award of attorney's fees under 18 U.S.C. § 1836(b)(3)(D).

## COUNT II

### MISAPPROPRIATION OF TRADE SECRETS UNDER THE KANSAS UNIFORM TRADE SECRETS ACT (K.S.A. § 60-3320, et seq.)
### (Against Stanton)

78.      Epiq incorporates by reference herein the allegations contained in Paragraphs 1 through 76 of the Complaint, as if fully set forth herein.

79.     The KUTSA permits an owner of a trade secret to bring a civil action to prevent any actual or threatened misappropriation of a trade secret. K.S.A. § 60-3320, et seq.

80.     Under the KUTSA, a "trade secret" is : "A formula, pattern, compilation, program, device, method, technique or process, that (1) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (ii) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." K.S.A. § 60-3320(4).

81.    Epiq derives economic value from the fact that its customer contract terms and pricing models, which are proprietary, are not known or readily ascertainable.

82.    Epiq invests substantial resources to develop its customer contract terms and pricing models and in maintaining the secrecy of that information.

83.    Epiq's customer contract terms and pricing models constitute statutorily protected trade secrets.

84.    Stanton knows that Epiq's customer contract terms and pricing models are extremely valuable to Epiq, and he is aware that Epiq treats that information with care to maintain its secrecy from competitors and the public.

85.    Stanton owed a duty to Epiq to maintain the secrecy of Epiq's trade secrets as an employee and former employee of Epiq and under the terms of his Employment Agreement with Epiq.

86.    Stanton took Epiq's trade secrets without permission and in violation of Epiq policy and in violation of his Employment Agreement with Epiq.

87.    By surreptitiously, and without consent, downloading competitively sensitive customer information, including customer pricing models and contract terms, Stanton misappropriated Epiq's statutorily protected trade secrets in violation of the Kansas Uniform Trade Secrets Act.

88.    The fact that Stanton downloaded Epiq's trade secret information before leaving Epiq's employment, with the intention of taking a job with a direct competitor, Lineal, in the same marketplace, indicates that Stanton has or intends to use and/or disclose Epiq's trade secrets in the course of his employment with Lineal for his own benefit and/or for the benefit of Lineal, acts that would cause irreparable harm to Epiq.

1616104207.6

89.     There exists an imminent threat that Epiq's trade secrets will be disclosed and used to the detriment of Epiq that poses threat of irreparable harm to Epiq that cannot be fully compensated by money alone and thus Stanton must be enjoined from disclosing and using Epiq's trade secrets and ordered to return all materials that contain or constitute Epiq's trade secrets, as permitted under the KUTSA, K.S.A. § 60-3321. Such injunctive relief would have a value to Epiq in excess of $75,000.

90.     As Stanton willfully and maliciously misappropriated its trade secrets, Epiq also seeks an award of attorney's fees under K.S.A. § 60-3323.

## COUNT III

## BREACH OF CONTRACT (NON-COMPETITION)
### (Against Stanton)

91.     Epiq incorporates by reference herein the allegations contained in Paragraphs 1 through 89 of the Complaint, as if fully set forth herein.

92.     The Employment Agreement between Epiq and Stanton is a valid, binding, and enforceable contract supported by adequate consideration.

93.     Stanton has breached or intends to breach in the immediate future the non-competition restrictions in Section 12 of the Employment Agreement by being employed by Lineal and performing services for Lineal that are the same as or similar to those he performed for Epiq.

94.     The restrictions in Section 12 of the Employment Agreement are reasonable in duration and scope and necessary to protect Epiq's legitimate business interests, including its interest in protecting its relations with its customers, which are the source of Epiq's revenue.

95.     Stanton's breach of his contract with Epiq will irreparably harm and otherwise damage Epiq unless enjoined by this Court. Such injunctive relief would have a value to Epiq in excess of $75,000.

## COUNT IV

### BREACH OF CONTRACT (NON-SOLICITATION OF CUSTOMERS)
**(Against Stanton)**

96.     Epiq incorporates by reference herein the allegations contained in Paragraphs 1 through 94 of the Complaint, as if fully set forth herein.

97.     The Employment Agreement between Epiq and Stanton is a valid, binding, and enforceable contract supported by adequate consideration.

98.     Stanton has breached or intends to breach in the immediate future the non-solicitation of customers restrictions in Section 15 of the Employment Agreement by being employed by Lineal in a sales role catering to a customer base that is the same as that served by Epiq.

99.     While transitioning out of the company, Stanton surreptitiously, and without permission, downloaded proprietary, confidential, and competitively sensitive information about Epiq's customers, including contract terms and pricing models.  Such conduct is indicative of his intention to use that information for the benefit of himself and his employer, Lineal, and to the detriment of Epiq.

100.     Stanton also interfered with the transition of certain customer accounts in connection with his departure, including deleting important client information and communications from Epiq's email systems.  Again, such conduct is indicative of his intent to solicit those Epiq customers with whom he worked when he is employed by Lineal.

101.     Stanton's breach of his contract with Epiq will irreparably harm and otherwise damage Epiq unless enjoined by this Court. Such injunctive relief would have a value to Epiq in excess of $75,000.

## COUNT V

## BREACH OF CONTRACT (CONFIDENTIALITY & TRADE SECRETS)
### (Against Stanton)

102.    Epiq incorporates by reference herein the allegations contained in Paragraphs 1 through 100 of the Complaint, as if fully set forth herein.

103.    The Employment Agreement between Epiq and Stanton is a valid, binding, and enforceable contract supported by adequate consideration.

104.    Stanton has breached and intends to breach in the immediate future the provisions in Sections 3 and 13 of the Employment Agreement that require Stanton to maintain the secrecy of Epiq's confidential information and trade secrets and to return all property of Epiq, which includes such information, by surreptitiously downloading and taking for his own use, and perhaps the use of his employer, Lineal, documents of Epiq that contain competitively sensitive information that is treated as confidential information and trade secrets by Epiq.

105.    The fact that, while transitioning out of the company, Stanton surreptitiously, and without permission, downloaded proprietary, confidential, and competitively sensitive information about Epiq's customers, including contract terms and pricing models, is indicative of his intention to use that information for the benefit of himself and his employer, Lineal, and to the detriment of Epiq.

106.    Epiq has demanded that Stanton return all such material to Epiq, and Stanton has not done so.

107.    Stanton's breaches of his contract with Epiq will irreparably harm and otherwise damage Epiq unless enjoined by this Court. Such injunctive relief would have a value to Epiq in excess of $75,000.

1616104207.6

## COUNT VI

## TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS
### (Against Stanton)

108.    Epiq incorporates by reference herein the allegations contained in Paragraphs 1 through 106 of the Complaint, as if fully set forth herein.

109.    Epiq has invested substantial resources into creating strong, long-standing, and financially beneficial relationships with its customers, including contractual relationships.

110.    Stanton is aware of the beneficial relationships and contracts between Epiq and its customers. Indeed, as part of his duties as an Epiq employee, he recruited customers for Epiq, managed the relationship between Epiq and its customers, and crafted and executed contracts on behalf of Epiq with its customers.

111.    Stanton has engaged in or intends to immediately engage in conduct that threatens to harm Epiq's customer relations and breach its customer contracts.

112.    Stanton's conduct is intentional and done for his own benefit.

113.    Stanton lacks legal justification or privilege for engaging in conduct that has or will lead to harm to Epiq's customer relationships. His conduct is outside the bounds of fair and ordinary competition and in clear violation of the reasonable contractual restrictions imposed by his Employment Agreement with Epiq.

114.    Unless Stanton is enjoined from further interfering with Epiq's customer relations, Epiq stands to suffer irreparable harm that cannot be fully compensated by money alone. Such injunctive relief would have a value to Epiq in excess of $75,000.

1616104207.6

## COUNT VII

### TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS
**(Against Lineal)**

115.    Epiq incorporates by reference herein the allegations contained in Paragraphs 1 through 113 of the Complaint, as if fully set forth herein.

116.    The Employment Agreement is a valid, binding, and enforceable contract between Epiq and Stanton.

117.    Lineal is aware of the existence and relevant terms of the Employment Agreement. If not previously aware, Lineal was specifically notified of the Employment Agreement by letter sent by outside counsel for Epiq on November 25, 2024. *See* Ex. D.

118.    Lineal's employment of Stanton in a sales role is a clear breach of Stanton's post-employment obligations and restrictions under the Employment Agreement and will cause irreparable harm to Epiq.

119.    Despite the initial notice, Lineal indicated that it intended to employ Stanton in a sales role for the company.  And, in response to Epiq's second letter, Lineal confirmed that Stanton had already started working for Lineal.

120.    Despite Lineal's knowledge of the Employment Agreement, it is tortiously and unlawfully interfering with Epiq's contractual relations with Stanton, and in so doing, it is using improper and unjustified means outside the bounds of fair and ordinary competition, by knowingly causing Stanton to breach his contractual obligations to Epiq.

121.    Lineal's conduct is intentional and done for its own benefit.

122.    Lineal lacks legal justification or privilege for its conduct.

123.    Unless Lineal is enjoined from employing or otherwise engaging Stanton to perform duties that are the same as or similar to those he performed for Epiq, Epiq stands to suffer

irreparable harm that cannot be fully compensated by money alone. Such injunctive relief would have a value to Epiq in excess of $75,000.

## COUNT VIII

### ATTORNEY'S FEES AND EXPENSES OF LITIGATION
(Against Stanton and Lineal)

124.    Epiq incorporates by reference herein the allegations contained in Paragraphs 1 through 122 of the Complaint, as if fully set forth herein.

125.    Epiq asserts all of its statutory and equitable rights to recover its attorney's fees and expenses of litigation incurred in the enforcement of the Employment Agreement and prosecution of the claims in this lawsuit.

## PRAYER FOR RELIEF[1]

Epiq respectfully requests that judgment be entered in its favor and against Stanton and Lineal as follows:

(a)    Enter an injunction enjoining Stanton from being employed by or performing any services for Lineal that are the same as or similar to the services he performed for Epiq;

(b)    Enter an injunction enjoining Stanton from directly or indirectly engaging in employment with or providing independent contractor or consulting services for any person, corporation firm or other entity that provides any service or services that are the same or similar to the service or services offered by Epiq or any

---

[11] At this time, Epiq seeks only injunctive relief and attorney's fees and litigation expenses in this action. The Employment Agreement provides that money damages against Stanton for breach of that contract are to be recovered through arbitration before the American Arbitration Association. In the event that Defendants proceed in a manner that further damages Epiq, or evidence reveals that actual harm has already occurred, Epiq reserves the right to amend its pleading here and/or to pursue arbitration to recover damages from either or both of the Defendants.

subsidiary or affiliate to which Stanton provided services during the course of his employment with Epiq;

(c)    Enter an injunction enjoining Lineal from engaging Stanton as an employee, independent contractor, or consultant providing any service or services that are the same or similar to the service or services offered by Epiq or any subsidiary or affiliate to which Stanton provided services during the course of his employment with Epiq;

(d)    Enter an injunction enjoining Stanton from directly or indirectly soliciting, servicing, or catering to any of Epiq's customers whom Stanton solicited, served, or catered to on behalf of Epiq or with whom he became acquainted during the course of his employment with Epiq;

(e)    Enter an injunction enjoining Stanton from directly or indirectly diverting or attempting to divert any of Epiq's customers or any of the business or patronage of such customers;

(f)    Enter an injunction enjoining Stanton from directly or indirectly calling upon, influencing, or attempting to influence any of Epiq's customers to transfer their business or patronage from Epiq to Stanton or to any other person, corporation, firm, company, or business entity engaged in a business similar to Epiq's business, including, but not limited to, Lineal;

(g)    Enter an injunction enjoining Stanton from directly or indirectly using or disclosing to any person, firm or corporation, including, but not limited to, Lineal, any confidential information or trade secrets of Epiq or any of its customers or vendors, or any confidential information Epiq received from a third party, including, but not

limited to, any proprietary information, technical data, trade secrets or know-how, information relating to research, product plans, products, services, customer lists, customers, markets, software, developments, inventions, processes, formulas, technology, designs, drawings, engineering, hardware configuration, marketing or finances, or other business information in any form including but not limited to electronic, oral,  visual, or hard copy;

(h)    Enter an injunction enjoining Lineal from directly or indirectly using or disclosing to any person, firm, or corporation any confidential information or trade secrets of Epiq or any of its customers or vendors that it received directly or indirectly from Stanton;

(i)    Enter an injunction requiring Stanton to identify all Epiq documents, materials, and information that he took from Epiq or that otherwise remained in his possession following the end of his employment with Epiq, to return those documents, materials, and information to Epiq, and to destroy any and all copies thereof;

(j)    Award Epiq all attorney's fees, costs, and disbursements in this action, available at law or equity, from Stanton and Lineal; and

(k)    Award Epiq all other and further relief as the Court may deem just and appropriate.

Dated: January 17, 2025

**LITTLER MENDELSON, P.C.**
/s/ Jeffrey D. Hanslick
Jeffrey D. Hanslick, #22612
1201 Walnut Street, Suite 1450
Kansas City, MO  64106
Direct: (816) 627-4408
E-Fax: (816) 817-2517
jhanslick@littler.com

**DLA PIPER LLP (US)**

/s/ Jamie M. Konn

Jamie M. Konn
Ga. Bar No. 419240
Alexandra M. Dishun
Ga. Bar No. 184502
(*pro hac vice* applications forthcoming)
1201 W. Peachtree Street
Suite 2900
Atlanta, Georgia 30309
Telephone: (404) 736-7800
Facsimile: (404) 682-7868
jamie.konn@us.dlapiper.com
alexandra.dishun@us.dlapiper.com

*Attorneys for Plaintiff Epiq eDiscovery Solutions, Inc.*

## **VERIFICATION**

I, Michael Conner, Regional Vice President Sales – West, Legal Solutions for Epiq eDiscovery Solutions, Inc., hereby state, under penalty of perjury, that I am personally familiar with the facts and circumstances giving rise to this Verified Complaint, that I have read this Verified Complaint, and that the facts stated in the Verified Complaint are true to my own knowledge, except those facts stated as to information and belief, and as to those facts, that I believe them to be true.

Executed this _____ day of January 2025 under 28 U.S.C. § 1746.

DocuSigned by:

*Michael Conner*

7F11A5B1A13744C...

**Michael Conner**
**Regional Vice President Sales – West, Legal Solutions**
**Epiq eDiscovery Solutions, Inc.**